J-S86015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF L.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 949 WDA 2016 |

Appeal from the Order June 9, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court Division at No(s):  CP-02-AP-0000001-2016

BEFORE:  GANTMAN, P.J., MOULTON, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                **FILED NOVEMBER 23, 2016**

Appellant, C.H. ("Father"), appeals from the June 9, 2016, order involuntarily terminating his parental rights to his minor child, L.S. (born in March of 2012), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (6), and (b).[1]  We affirm.

The relevant facts and procedural history are as follows:  L.S. was born in March of 2012 to Mother, who was single and had never been

---

[1] Mother signed a consent for adoption as to L.S., and following a hearing, the trial court confirmed Mother's consent.  Mother is not a party to this appeal, and she has not filed a separate appeal.

\* Former Justice specially assigned to the Superior Court.

married.[2]  L.S. was living with maternal grandmother, until he was removed by the Allegheny County Office of Children, Youth, and Families ("CYF") on August 14, 2014.[3]  At this time, Mother could not be located and Father was incarcerated at SCI Greene for homicide with 2021 as his earliest release date.

On September 3, 2014, L.S. was adjudicated dependent, and due to lack of contact, the trial court determined aggravated circumstances existed such that CYF was relieved of its obligation to provide reunification efforts for Mother. On January 8, 2016, CYF filed a petition for the involuntary termination of Father's parental rights as to L.S.,[4] and on January 20, 2016, the goal for L.S. was changed to adoption.

On June 3, 2016, the trial court held a hearing as to CYF's petition to terminate Father's parental rights.  At the hearing, Jessica Andrews, a CYF caseworker, testified that Father was incarcerated in 2012, and he completed parenting classes during his incarceration.  *Id.* at 12.  In August

_____

[2] Mother did not list a father on L.S.'s birth certificate; however, she later informed authorities that Father was L.S.'s biological father.  Subsequent genetic testing in December of 2014 confirmed Father is L.S.'s biological father.

[3] Mother left L.S. in the care of maternal grandmother in June of 2014 and then failed to return.  Upon investigation, it was discovered that maternal grandmother and maternal grandfather had extensive criminal histories.

[4] The petition also sought the involuntary termination of Mother's parental rights; however, CYF later withdrew its petition when Mother signed the consent for adoption, which the trial court confirmed.

of 2015, L.S. began visiting Father at the prison in Waynesburg, Pennsylvania. N.T., 6/3/16, at 12-13. Caseworkers, including Ms. Andrews, drove L.S. for the visitations. *Id.* at 13. Ms. Andrews testified that she witnessed the visitations, and in particular, she testified as follows:

> [L.S.] is very active. He's a 4-year-old child and he likes to run around and play. And during—there is a visiting room and stuff and so he likes to be in there. So I try to get him to be out in—because [Father] isn't allowed in the playroom. They don't let inmates in the playroom. So I try to get [L.S.] to stay out in the visitation area where he can actually visit with [Father], but there is a lot of him just running around and me chasing him to try to get him to stay put to visit with [Father] and a lot of me trying to, you know, get him to just play with the toys right there.

*Id.* at 13-14.

As to whether Father is able to redirect or chase L.S. during the visits, Ms. Andrews testified:

> I don't know if [Father] is actually allowed to get up and chase after him. That, I'm not sure of but I believe that it's been—the interaction seems kind of awkward which would be understandable given that it's my understanding that the first time [Father] met [L.S.] was when I took [L.S.] for his first visit on August 29th of 2015. So there is a bit of unfamiliarity, whereas [L.S.] at that point had known me for over a year and [I] had been visiting and seeing him on a regular basis because of that. So there are a number of factors I think that play into that.

*Id.* at 14.

Ms. Andrews testified that, during the visits, Father will hug L.S. and try to talk to him, but it is difficult because L.S. just wants to play. *Id.* Ms.

Andrews testified that, if Father's parental rights are terminated, there will be no detriment to L.S. as it relates to a parent-child bond. *Id.* at 14-15.

Ms. Andrews testified Father asked that L.S. be placed with paternal grandmother and, accordingly, in January of 2015, Ms. Andrews went to paternal grandmother's residence. However, upon inspection of the residence, Ms. Andrews discovered three roommates residing with paternal grandmother. One of the roommates was a registered Megan's Law sex offender; one of the roommates had been indicated on ChildLine for sex abuse; and one of the roommates had previously had her parental rights as to her children terminated due to physical abuse. *Id.* 17-18. Accordingly, CYF did not deem paternal grandmother to be suitable for placement purposes. *Id.* at 18.

Thereafter, Father informed CYF that his brother had evicted paternal grandmother's roommates, and thus, he asked that CYF reconsider placing L.S. with paternal grandmother. *Id.* However, CYF indicated it declined to do so since paternal grandmother identified one of the roommates as her paramour and there was "a trust issue." *Id.*

Ms. Andrews testified that L.S. was placed with a foster mom and dad, and their adult daughter, A.T., moved in with them in February of 2015 to assist with L.S.'s care. A.T. indicated she had become attached to L.S. and, therefore, on December 15, 2015, placement of L.S. was officially granted to

A.T. with the goal of adoption.[5]  *Id.* at 15-16.  Ms. Andrews noted that Dr. Rosenblum had evaluated A.T. and L.S., and he recommended that A.T. be permitted to adopt L.S.  *Id.* at 16.  Moreover, Ms. Andrews testified CYF has concluded that it would be detrimental to remove L.S. from the care of A.T. as he has lived with her for close to a year and a half.  *Id.* at 19.

Ms. Andrews denied that CYF was seeking termination of Father's parental rights solely due to his incarceration; but rather, she indicated CYF was seeking termination as "he's not capable of providing the care and control that [L.S.] needs."  *Id.*  She opined that termination of Father's rights would best meet L.S.'s needs and welfare.  *Id.*

On cross-examination, Ms. Andrews admitted that Father attempted to maintain contact with L.S. by sending letters and cards to him.  *Id.* at 24.  She also admitted that Father seemed to want to establish a bond with L.S.; however, "it was just difficult because there hadn't been a prior relationship and trying to build that is difficult with a child that wants to run around." *Id.* at 23.

Father, who was represented by counsel, testified that, as soon as paternity testing confirmed that L.S. was his biological child, he requested visitation through CYF.  *Id.* at 28.  He testified that he has done all that he

---

[5] The record reveals that L.S. has a half-sibling, A.M.J.  The children have the same biological mother but different biological fathers.  Along with L.S., A.M.J. has also been placed with A.T. with the goal of adoption.

was supposed to do to begin visitations, and he has had "more than three or four" visits with L.S. *Id.* at 27-28. Father testified that "[t]he visits were nice. I enjoyed them. Because like Ms. Andrews said, he's very playful and he's happy all the time. So I enjoyed all the visits." *Id.* at 28. Father noted he has maintained contact with the caseworker, has completed parenting classes, has written letters to L.S., and has sent cards to L.S. *Id.* at 28-29.

Father indicated that, when he suggested paternal grandmother as a placement resource, he was unaware that she had other people living in her home. *Id.* at 29-30. When he was informed of the fact by CYF, he enlisted the help of his brother to have the people evicted because he "want[s] [his] son." *Id.* at 30. Father indicated he was contesting the termination of his parental rights because he does not want to give up his child and it is only because of his incarceration that his relationship with L.S. is hindered. *Id.* at 30. Father testified that he was incarcerated in 2011, and when he was told that Mother alleged he was the biological father of L.S., he wanted it confirmed via a paternity test. *Id.* He noted that he "took the test" in October of 2013, but he had to wait an entire year for the results. *Id.* at 30-31.

Father admitted that he is "limited" as to what he can do for L.S. and "all [he] can do at the time [is] reach out to the family, potential people to see if they can help." *Id.* at 31. Father indicated he loves L.S., and it is the

only child he has. *Id.* He acknowledged his earliest release date from prison is 2021. *Id.* at 32.

On cross-examination, Father indicated he would concur with the caseworker's report that he had seven visits with L.S. *Id.* He acknowledged that he knew Mother was pregnant when she testified against him at his criminal trial, but he did not think the baby was "his baby." *Id.* at 32-33. He admitted that because of his incarceration he is not able to care for L.S.; however, he wants L.S.'s paternal grandmother to care for L.S. *Id.* at 33-34.

At the conclusion of all testimony, by order entered on June 9, 2016, the trial court granted CYF's petition to involuntarily terminate the parental rights of Father. Specifically, the trial court determined that CYF met the grounds for termination under 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Father filed a timely counseled notice of appeal, as well as a contemporaneous statement pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

Father raises the following issues in his counseled brief:

1. Is the trial court's findings of grounds for involuntary termination of [Father's] parental rights under 23 Pa.C.S.[A.] § 2511(a)(2), (5), and (8) proven by [a] showing of clear and convincing evidence?

2. Is the trial court's finding that termination of parental rights serves the developmental, physical and emotional needs and welfare of the child [ ] proven by clear and convincing evidence under 23 Pa.C.S.[A.] § 2511(b)?

J-S86015-16

Father's Brief at 5.[6]

Our Supreme Court has set forth the following standards in reviewing

the termination of parental rights.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.* As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.* Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (1994).

---

[6] Father has presented no issues regarding the trial court's order changing the permanency goal for L.S. to adoption.

- 8 -

*In re Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012) (some internal citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009). Moreover, we have explained "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)).

In terminating Father's parental rights, the trial court relied on Subsections 2511(a)(2), (5), (8), and (b) of the Adoption Act. This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one Subsection of 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). In the case *sub judice*, we will focus on Subsections 2511(a)(2) and (b).

Section 2511 provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be

- 9 -

without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We have stated:

In order to terminate parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citations omitted).

"The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental

- 10 -

duties." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa.Super. 2002) (citations

omitted). Further, as our Supreme Court has held:

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to [subsection] 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

***In re Adoption of S.P.***, 616 Pa. at 332, 47 A.3d at 830-31 (citations and

parentheticals omitted).

In terminating Father's parental rights under Subsection 2511(a)(2),

the trial court relevantly found the following:

> Father, who has been imprisoned since 2011, met [L.S.] for the first time in August, 2015, when visits with [L.S.] were scheduled at SCI Greene. Since then, Father's only interactions with [L.S.] have been occasional visits at SCI Greene [ ] which, according to the testimony of the attending CYF caseworker[,] are "awkward" due to the "unfamiliarity" between [L.S. and Father]. Father has never provided [L.S.] with daily parental care and supervision, and Father's "repeated and continued incapacity" has "caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being." ***See*** 23 Pa.C.S.A. § 2511(a)(2).
>
> [The trial court] concluded, furthermore, that the conditions which led to the removal of [L.S.] continue to exist and could not be remedied, within a reasonable period of time,

given the length of time remaining before Father's earliest possible release date in 2021, at which time [L.S.]—who was over three years old when he first met Father, and who [ ] has never resided with Father or interacted with Father except for periodic visits at SCI Greene—will be nine to ten years old. Accordingly, [the trial court] concluded that Father has not in the past, and will not within a reasonable time, be able to provide for the child's needs[.]

Trial Court Opinion, dated 8/8/16, at 6-7.

After a thorough review of the record, we conclude the trial court did not abuse its discretion by concluding CYF met its burden of proving termination of Father's parental rights was warranted, by clear and convincing evidence, under Subsection 2511(a)(2). *In re R.N.J.*, *supra*. The evidence clearly demonstrates that Father is incapable of providing L.S. with parental care, control, or subsistence necessary for his physical or mental well-being. While Father may claim to love L.S., a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010). We have stated that a child's life "simply cannot be put on hold" in the hope that a parent will somehow summon the ability to handle the responsibilities of parenting. *Id.* Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004).

After we determine that the requirements of Subsection 2511(a) are satisfied, we proceed to review whether the requirements of Subsection 2511(b) are satisfied. *See In re C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*). This Court has explained that the focus in terminating parental rights under Subsection 2511(a) is on the parent, but, under Subsection 2511(b), the focus is on the child. *Id.* at 1008.

In reviewing the evidence in support of termination under Subsection 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [The court] [has] held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 620 Pa. 602, 628-29, 71 A.3d 251, 267 (2013) (quotation and citations omitted).

As to the bond analysis, we have stated that, in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, *supra*. This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the

- 13 -

child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa.Super. 2008).

In concluding termination of Father's parental rights was in L.S.'s best interest under Subsection 2511(b), the trial court relevantly found the following:

> [The court], in terminating Father's parental rights, considered the developmental, physical and emotional needs of [L.S.] pursuant to 23 Pa.C.S.A. § 2511(b), and determined that termination was warranted in light of [L.S.'s] lack of any relationship with Father from birth until August of 2015, and [L.S.'s] limited relationship with Father thereafter, together with the fact that Father has been imprisoned since 2011, and will not be able to provide for [L.S.'s] daily needs, at least until his earliest possible release date in 2021. In addition, evidence and testimony presented at the hearing indicated that [L.S.] displayed a "very strong emotional connection" to his pre-adoptive mother, referring to her as "Mommy," and that [L.S.] "respond[s] very well to her." (*See* Ex. 2 Expert Report of Dr. Rosenblum, 7/31/15). Moreover, CYF presented evidence and testimony that she has "earned the child's love and trust," is "attached" to him, is eager to assume parental responsibility, and has the ability to effectively provide for [L.S.'s] needs.

Trial Court Opinion, dated 8/8/16, at 7-8.

Further, the trial court recognized that it would not be in L.S.'s best interest to reside with paternal grandmother, as suggested by Father, in light of the criminal history of paternal grandmother's roommates, as well as the fact L.S. has never met paternal grandmother. *Id.* at 8. The trial court concluded that "given the length of time that [L.S.] has resided with [pre-adoptive mother], with whom [L.S.] has formed a bond, it would be detrimental to remove him from [her] care." *Id.* at 9.

- 14 -

After a thorough review of the record, we conclude the trial court did not abuse its discretion in terminating Father's parental rights under Subsection 2511(b). While Father argues that CYF did not meet its burden since the evidence was insufficient to establish a lack of a parental bond between him and L.S., we disagree. Ms. Andrews, the CYF caseworker, testified that, if Father's parental rights are terminated, there will be no detriment to L.S. as it relates to a parent-child bond. N.T., 6/3/16, at 14-15. Moreover, Father admitted that he visited with L.S. a total of seven times during L.S.'s lifetime, and all of these visits occurred at the prison. Accordingly, we reject Father's claim.

For all of the foregoing reasons, we affirm the trial court's June 9, 2016, order terminating Father's parental rights as to L.S. on the basis of Subsections 2511(a)(2) and (b) of the Adoption Act.

Affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/23/2016